**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

PETESKI PRODUCTIONS, INC.,                §
                                          §
          Plaintiff,                      §   **CIVIL ACTION NO.  5:17-CV-00122-JRG**
                                          §
v.                                        §
                                          §
LEAH ROTHMAN                              §
                                          §
          Defendant.                      §


<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is Defendant Leah Rothman's ("Defendant" or "Rothman") Motion to

Dismiss or Alternatively for Summary Judgment (Dkt. No. 10) ("the Motion").  Having considered

the Motion, and for the reasons set forth below, said Motion is hereby **DENIED** with respect to

fair use and, *sua sponte*, summary judgment is **GRANTED** in favor of Plaintiff on the issue of fair

use.

## I.  <u>Background</u>

Rothman worked for Plaintiff Peteski Productions, Inc. ("Plaintiff" or "Peteski") as a

Segment Director for The Dr. Phil Show from 2003 to early 2015.  (Dkt. No. 10 at 2.)  In April

2015, Rothman sued Peteski and Dr. Phil McGraw in California state court for false imprisonment,

intentional infliction of emotional distress, retaliation, and wrongful termination.  (Dkt. No. 32-1;

Dkt. No. 32-2.)  Before filing her state court action, Rothman attempted to document a "bona fide

example of Dr. McGraw's conduct for her lawsuit" (Dkt. No. 10 at 2) by recording, using her

iPhone, a nine-second clip of Dr. McGraw from a larger archive of unaired footage from his

eponymous television show.  (Dkt. No. 10-2 at ¶ 8; Dkt. No. 32-5 at 218:25–220:18.)  However,

as part of her employment Rothman had agreed, among other things, "to keep confidential and never disclose, use, [or] misappropriate . . . any statements or comments concerning Dr. Phil McGraw, the Dr. Phil show, or any of his/its Confidential Information." (Dkt. No. 32 at 10–12.)

On May 9, 2017, Peteski obtained a registered copyright in the nine seconds of video that Rothman recorded from The Dr. Phil Show archives. (Dkt. No. 1-1.) On June 15, 2017, Peteski filed this lawsuit against Rothman alleging infringement of that registered copyright. (Dkt. No. 1.) Defendant filed the instant Motion to Dismiss or Alternatively for Summary Judgment on July 10. (Dkt. No. 10.) In the Motion, Defendant sought to dismiss for improper venue, lack of personal jurisdiction, and for failure to state a claim, or alternatively for summary judgment that her copying was fair use. (*Id.*)

On July 12, 2017, Defendant filed an emergency motion seeking a partial stay of this case so that the Court could address her fair use defense before assessing the propriety of venue or personal jurisdiction and before permitting any discovery. (Dkt. No. 17.) In granting this motion, the Court also, at Defendant's request and based on the need to consider evidence outside the complaint in evaluating Rothman's fair use defense, converted the underlying motion to dismiss with respect to fair use into a motion for summary judgment on Rothman's fair use defense. (Dkt. No. 26.) Consequently, this opinion addresses only Rothman's claim of fair use.

## II.   Legal Standard

### A.  Fair Use

"[A]nyone who . . . makes a fair use of [a] work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984). This principle has been recognized since "the infancy of copyright protection" as a "necessary" tool for "fulfill[ing] copyright's very purpose." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

575 (1994).  "Since its beginnings, the doctrine of fair use has been refined, honed, and clarified in many Court decisions."  *Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1174 (5th Cir. 1980).  However, at the most basic level fair use is a "rule of reason fashioned by Judges to balance the author's right to compensation for his work, on the one hand, against the public's interest in the widest possible dissemination of ideas and information, on the other."  *Id.* (internal quotation marks omitted).

Congress codified fair use as an affirmative defense to copyright infringement at 17 U.S.C. § 107.  *See Triangle Publ'ns*, 626 F.2d at 1174; *Campbell*, 510 U.S. at 590.  In doing so, "Congress . . . in no way intended to depart from Court-created principles" of fair use.  *Triangle Publ'ns*, 626 F.2d at 1174.

Under § 107, courts consider at least four statutory factors in evaluating fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  None of these factors are exclusive or dispositive, *Campbell*, 510 U.S. at 584, but "[c]ourts have generally placed most emphasis on the fourth factor."  *Triangle Publ'ns*, 626 F.2d at 1175.  *But see Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be the significance of other factors . . . .").

### B.  Summary Judgment

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence presented, viewed in the light most favorable to the nonmoving party, would permit a reasonable jury to find for the nonmoving party.  *Id.*  However,

such evidence, whether it is offered by the movant to satisfy their initial burden or by the nonmovant to defeat a properly supported motion for summary judgment, may not consist entirely of "conclusory allegations" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Likewise, such evidence must be "*capable* of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) (emphasis in original).

"Fair use is a mixed question of law and fact, which means that it may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion—but not otherwise." *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516–17 (7th Cir. 2002) (internal quotation marks and citations omitted) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985); *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir.1989);  *Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 524 (2d Cir.1991)).  "However, where the district court has 'acts sufficient to evaluate each of the statutory factors,' it may conclude as a matter of law that the challenged use is not a protected fair use." *Castle Rock Entm't v. Carol Publ'g. Grp., Inc.*, 955 F. Supp. 260, 267 (S.D.N.Y. 1997) (Sotomayor, J.), *aff'd Castle Rock Entm't, Inc. v. Carol Publ'g. Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998).  This is particularly true where there is no genuine dispute with respect to the facts necessary to evaluate each factor.  *See Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986) ("The parties dispute only the ultimate conclusions to be drawn from the admitted facts.  Because, under *Harper & Row*, these judgments are legal in nature, we can make them without usurping the function of the jury.").

### III.    <u>Discussion</u>

#### A.  **Applicability of Fair Use**

At the outset, Plaintiff argues that "as a threshold matter, fair use is not an available defense because Rothman admits that she stole the Work." (Dkt. No. 32 at 2.)  In support of its position, Plaintiff primarily relies on the Supreme Court's statement in *Harper & Row* that "[f]air use presupposes good faith and fair dealing."  471 U.S. at 562 (internal quotation marks omitted).

Plaintiff's reliance on *Harper & Row* is unavailing for several reasons.  First, in *Harper & Row*, the Supreme Court did not end its analysis of fair use based on the fact that the defendant had "purloined" the underlying work.  *Id.* at 563.  Instead, the Court assessed each factor, giving weight to the unpublished nature of the underlying work, the fact that the amount taken was the "heart" of the work, and the effect that the use had on the market for the work.  *Id.* at 561–568.  Second, the Supreme Court returned to its earlier statement that fair use "presupposes good faith and fair dealing" in *Campbell*.  510 U.S. at 585 n.18.  There, the Court left at best unresolved the role that bad faith plays in fair use.  *Id.* ("[R]egardless of the weight one might place on the alleged infringer's state of mind . . . [e]ven if good faith were central to fair use, 2 Live Crew's actions do not necessarily suggest that they believed their version was not fair use . . . ." (citing *Harper & Row*, 471 U.S. at 562)).  Third, numerous courts have found that bad faith is not dispositive of fair use.  *See, e.g., NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 (2d Cir. 2004); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 n.6 (9th Cir. 2012); *Am. Inst. of Physics v. Winstead PC*, No. 3:12-cv-1230, 2013 WL 6242843, at *12 (N.D. Tex. Dec. 3, 2013) (discussing the exact cases relied on by Plaintiff here and concluding that they "do not stand for the proposition that the acquisition of the original work must be in good faith" (internal quotation marks omitted)).  Finally, the Supreme Court and Congress have consistently rejected presumptions and per se rules

in the context of fair use.  *See Campbell*, 510 U.S. at 594 ("It was error for the Court of Appeals to conclude that the commercial nature of 2 Live Crew's parody of 'Oh, Pretty Woman' rendered it presumptively unfair."); 138 Cong. Rec. E2610-02, 1992 WL 221274 (1992) (statement of Rep. Moorhead) ("The purpose of H.R. 4412 [1992 amendment to 17 U.S.C. § 107] is to clarify the intent of Congress that there be no per se rule barring claims of fair use of unpublished works. Instead, consistent with Congress's codification of fair use in the 1976 Copyright Act, the courts are to determine claims of fair use of unpublished works on a case-by-case basis."); 138 Cong. Rec. S17358-01, 1992 WL 275324 (1992) (statement of Sens. Simon, Leahy, Kennedy, Grassley, Metzenbaum, and Kohl) (discussing the 1992 amendment to 17 U.S.C. § 107 and clarifying that it is designed to reject a "per se approach" to fair use, at least with respect to evaluating unpublished works).

Ultimately, the Court concludes that bad faith is not a *per se* bar to fair use.  The relevance and appropriate weight given to bad faith in the fair use inquiry is addressed below.

### B.  Consideration of the Fair Use Factors

The Court begins by analyzing each statutory fair use factor.  As explained above, none of these factors are exclusive or dispositive.  *Campbell*, 510 U.S. at 584.

#### 1.  Purpose and Character of the Use

Under the first factor, courts often consider the culpability of a defendant's conduct in acquiring or using a work, the extent to which such use is transformative, and whether such use is for commercial or non-commercial purposes.  *See, e.g., NXIVM*, 364 F.3d at 478 ("*Harper & Row* directs courts to consider a defendant's bad faith in applying the first statutory factor."); *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 823 (5th Cir. 2002) ("The key question under the 'purpose and character' prong is . . . whether and to what extent the new work is

6

'transformative.'"); *Campbell*, 510 U.S. at 584 ("[T]he commercial or nonprofit educational purpose of a work is . . . one element of the first factor . . . .").

### i.    Defendant's Conduct

Plaintiff argues that "Rothman's inequitable conduct and bad faith behavior" weigh "significantly" against a finding that the first factor favors fair use.  (Dkt. No. 32 at 20.)

At the outset, evaluating this argument requires determining what conduct by a defendant might weaken a claim to fair use.  *Harper & Row* is instructive on this point.  There, the Supreme Court explained that "[f]air use distinguishes between a true scholar and a chiseler who infringes a work for personal profit."  *Harper & Row*, 471 U.S. at 563 (internal quotation marks omitted).  The Court went on to conclude that because "The Nation knowingly exploited a purloined manuscript" the first factor weighed against fair use.  *Id.* at 562–563 (citing *Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968)).  In dissent, Justice Brennan questioned whether The Nation had evidenced bad faith by distinguishing its conduct from the defendant in *Time*, who "personally stole film negatives from the offices of Time."  *Id.* at 594 n.18 (Brennan, J., dissenting).  Several other courts have acknowledged that "a breach of confidence or deception" in acquiring the underlying work should weigh against a finding of fair use.  *Winstead*, No. 3:12-cv-1230, 2013 WL 6242843, at *12.  *See also DSC Commc'ns. Corp. v. DGI Techs., Inc.*, 898 F. Supp. 1183, 1194 (N.D. Tex. 1995) (no fair use where defendant "knowingly exploited an agreement . . . in order to acquire, what they could not buy on the open market"), *aff'd* 81 F.3d 597 (5th Cir. 1996); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) ("An unlawful acquisition of the copyrighted work generally weighs against a finding of fair use . . . ."); *NXIVM*, 364 F.3d at 478 ("[T]o the extent that Ross, Martin, or Hochman knew that his access to the manuscript was unauthorized or was derived from a violation of law or breach of duty, this

consideration weighs in favor of plaintiffs.").  Merely making use of a work without permission, however, is not necessarily evidence of bad faith.  In fact, the Fifth Circuit has described fair use as "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner *without his consent*."  *Triangle Publ'ns*, 626 F.2d at 1174 (emphasis added). *See also Campbell*, 510 U.S. at 585 n.18 ("If the use is otherwise fair, then no permission need be sought or granted.").

Plaintiff identifies two examples of bad faith that should weigh against a finding of fair use.  (Dkt. No. 32 at 20–21.)

First, Plaintiff argues that Rothman stole the underlying work so she could sell it to the National Enquirer.  (*Id.* at 21.)  To support this allegation, Plaintiff points to voice messages left for Rothman by the National Enquirer, an article published by the National Enquirer, and a declaration from L. Lin Wood, who represented Dr. McGraw in a defamation action against the National Enquirer.  (*Id.* at 2.)  However, Plaintiff has identified no evidence from which a jury could reasonably conclude that Rothman stole the work at issue here to sell it to the National Enquirer.[1]  For example, the voice messages do not indicate that Rothman ever spoke with the National Enquirer.  If anything, they suggest the opposite.  Likewise, the National Enquirer article merely lifts facts from Rothman's complaint against Dr. McGraw in California.  (Dkt. No. 32-10 (showing a copy of Rothman's complaint and quoting from it).)  Finally, the Wood Declaration simply concludes, based solely on Ms. Wood's "review and investigation," that Defendant was "likely paid a substantial sum of money to provide false information . . . to the National Enquirer." (Dkt. No. 32-12 at ¶ 2.)  No additional pieces of evidence or materials were submitted by Plaintiff

---

[1] (*See also* Dkt. No. 43 at 42:1 ("THE COURT: All right.  As of today, you've got nothing other than speculation about somebody thinking that somebody got paid, but there's no proof today.  I'm not saying what you may or may not find at a later date, but as of right now, there's not evidence of one nickel having changed hands over this story? MR. BABCOCK: That's right, Your Honor.").)

along with this declaration.  Without more, "a single conclusory . . . affidavit, devoid of any factual support or explanation . . . [is] insufficient to meet Plaintiffs' burden of designating specific facts showing that there is a genuine issue for trial."  *Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217, 219 (5th Cir. 2015) (unpublished) (internal quotation marks and brackets omitted); *Little*, 37 F.3d at 1075 (concluding that nonmovant's burden is not satisfied by "conclusory allegations" or "unsubstantiated assertions").[2]

Second, Plaintiff argues that Rothman stole the underlying work in violation of various employment and confidentiality agreements.  (Dkt. No. 32 at 10–12.)  On this point, there is no real dispute.  Rothman has already admitted that she recorded the video from The Dr. Phil Show archives using her iPhone.  (Dkt. No. 32-5 at 218:25–220:18.)  Moreover, Defendant offered no evidence to dispute that this recording violated several agreements between Rothman and Peteski.[3] For example, one agreement noted that Rothman was "obligated to keep confidential and never disclose, use, [or] misappropriate . . . any statements or comments concerning Dr. Phil McGraw, the Dr. Phil show [sic], or any of his/its Confidential Information."  (Dkt. No. 32 at 10–12.) Another agreement "prohibited . . . recording the conduct of any CBS business via tape recorder, electronic recording device, or any other nonmanual or nonwritten means."  (*Id.*)  Together, these uncontroverted facts weigh against a finding of fair use.  *See, e.g., Time*, 293 F. Supp. at 136 ("[T]he fact that Thompson was making the copies . . . with his own camera shows his recognition of the impropriety."); *DSC Commc'ns Corp.*, 898 F. Supp. at 1194 (copying in breach of contract

---

[2] While Ms. Wood is not an expert, as in *Stagliano*, this does little to distinguish that case.  Instead, *Stagliano* applies with even more force to justify the exclusion of conclusory allegations by non-experts.

[3] Rothman's accompanying affidavit does not suggest that she believed her conduct was appropriate.  At most, Rothman states that she "did not realize that [the video] may be or was *copyrighted*."  (Dkt. No. 10-2 at ¶ 8 (emphasis added).)  However, her employment and confidentiality agreements prohibited the "use" or "recording" of sensitive information like the contents of the work at issue here regardless of whether it was copyrighted.  (Dkt. No. 32 at 10-12.)  There is no question that Rothman's copying was improper and violative of her agreements with Peteski.

or agreement weighs against fair use), *aff'd,* 81 F.3d 597 (5th Cir. 1996); *Winstead*, No. 3:12-cv-1230, 2013 WL 6242843, at \*12 (same); *NXIVM*, 364 F.3d at 478 (same).

The more challenging question is how strongly Rothman's conduct weighs against a finding of fair use. In *Harper & Row*, the Supreme Court gave significant weight to the fact that The Nation had "purloined" the underlying manuscript. 471 U.S. at 562. By contrast, in *Campbell*, the Supreme Court suggested that "the alleged infringer's state of mind" may not even be relevant to a determination of fair use. 510 U.S. at 585 n.18. The Second Circuit addressed this tension in *NXIVM* by giving some weight to the defendant's conduct, while noting that "bad faith is not to be weighed very heavily" under the first factor and inviting "clearer renunciation [by the Supreme Court] than the *Campbell* footnote of bad faith's relevance . . . to the fair use inquiry." 364 F.3d at 479 n.2. No renunciation has arrived. *See Blanch v. Koons*, 467 F.3d 244, 262 (2d Cir. 2006) (Katzmann, J., concurring) (acknowledging "the contentious battle over the role of good faith in the post-*Campbell* fair use inquiry"). Accordingly, the Court concludes that conduct involving a violation of law or breach of confidence weighs strongly, though not dispositively, against a potential fair user under this element of the first factor.

This is especially true where the copying is for a purely self-serving purpose. Rothman did not copy to then educate the masses or to further the greater good. She copied to aid her pending lawsuit seeking money damages where she is the only plaintiff and sole potential beneficiary. It is possible that a breach of contract or some other act of bad faith may sometimes be necessary to further an important public interest and therefore such conduct might not always weigh against fair use. However, there is a difference between a defendant who "purloins" a private manuscript or confidential video for personal gain and one who obtains, or even misappropriates, materials of significant public interest. *Compare Time*, 293 F. Supp. at 146

(finding fair use where defendant stole videos of Kennedy assassination because of countervailing public interest in access to these videos); and *Shady Records, Inc. v. Source Enterprises, Inc.*, No. 03 CIV. 9944, 2005 WL 14920, at *18 (S.D.N.Y. Jan. 3, 2005) ("[E]ven while imputing bad faith to the Source Parties, [a court] may nonetheless conclude that this is outweighed in the final analysis by the importance of the dissemination of the recordings to the public."), *with Iowa State Univ. Research Found., Inc. v. Am. Broad. Comp., Inc.*, 621 F.2d 57, 61 (2d Cir. 1980) (theft of student film and subsequent rebroadcast on ABC was not justified by potential public interest in an Olympic athlete).  Here, there is no countervailing public interest because Rothman copied the work at issue "solely" for use in her own lawsuit.  (Dkt. No. 10-2 at ¶ 9 ("I recorded the video clip solely because I thought I might need a bona fide example of Dr. McGraw's conduct for my lawsuit.").).

The weight given to Rothman's conduct is in accord with *Harper & Row*, how courts in this circuit have treated the question,[4] and the historical role that bad faith has played in the fair use inquiry.  *See, e.g.,* Barton Beebe, *An Empirical Study Of U.S. Copyright Fair Use Opinions*, 1978–2005, 156 U. Pa. L. Rev. 549, 607–08 (2008) (evaluating nearly three decades of fair use opinions and concluding that "where courts explicitly [find] that the defendant's conduct was undertaken in bad faith, courts almost invariably [find] no fair use").  *Campbell* does not compel a different result.  At most, it suggests that using a copyrighted work without permission might not reflect bad faith.  *Campbell*, 510 U.S. at 585 n.18 (citing *Folsom v. Marsh*, 9 F. Cas. 342, 349 (C.C.D. Mass. 1841) (Story, J.) (questioning whether "an invasion of the plaintiffs' copyright" reflects "bad intentions")).  The Supreme Court has never held that fair use excuses theft or justifies

---

[4] *See, e.g., DSC Commc'ns Corp.*, 898 F. Supp. at 1194; *Winstead*, No. 3:12-cv-1230, 2013 WL 6242843, at *12.

deception.  In fact, *Harper & Row* suggests just the opposite.  Accordingly, Rothman's conduct weighs against a finding that the first factor favors fair use.

### ii.    Transformativeness

In determining whether a use is transformative, courts look to "whether the new work merely supersedes the objects of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579 (internal quotation marks, brackets, and citations omitted).

There is no genuine dispute in this case about why Rothman surreptitiously recorded the video of Dr. McGraw.  By her own admission, Rothman "recorded the video clip solely because [she] thought [she] might need a bona fide example of Dr. McGraw's conduct for [her] lawsuit." (Dkt. No. 10-2 at ¶ 9.)  Defendant argues that such a use is transformative because many courts have found that using a work in a judicial proceeding - even an entire copy of a work - is generally a fair use.  *See, e.g., Religious Tech. Center v. Wollersheim*, 971 F.2d 364, 367 (9th Cir. 1992); *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002) (noting that reproduction of a work in a judicial opinion is "a good example of the fair-use doctrine in action"); *Shell v. DeVries*, No. 07-1086, 2007 WL 4269047, at *1 (10th Cir. Dec. 6, 2007) (unpublished); *Hollander v. Steinberg*, 419 F. App'x 44, 47 (2d Cir. 2011) (unpublished).  Indeed, Congress even listed the "reproduction of a work in legislative or judicial proceedings" as an example of a potential fair use in the House Report accompanying codification of fair use at § 107.  H.R. Rep. No. 94-1476 (1976).  *See also* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[D][2] (2017) ("Works are customarily reproduced in various types of judicial proceedings . . . and it seems inconceivable that any court would hold such reproduction to constitute infringement . . . .").

While it is true that many courts and commentators have acknowledged the general principle that use of a work in a judicial proceeding may be considered fair use, fewer have addressed whether copying an entire work in preparing a complaint is transformative.   For example, *Wollersheim*, upon which Defendant relies, includes only a cursory discussion of fair use and makes no mention of transformativeness.  971 F.2d at 364.  Here, Rothman made no alteration to the work nor did she use it as part of a commentary or criticism.  *See Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 823 n.48 (5th Cir. 2002) (Wiener, J.; King, J.; Higginbotham, J.; Davis, J.; Stewart, J.; Dennis, J., dissenting) (suggesting that a use is not transformative if it makes no alteration to or commentary on the underlying work).  Instead, she copied the work to give to her lawyers in her California lawsuit. Even if such a use is transformative, it is not highly transformative.

### iii.       Commercial/Non-Commercial Use

"The crux of the profit/nonprofit distinction is . . . whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.

Given that there is no genuine dispute about why Rothman took a recording of the copyrighted work, see *supra* Section III.B.1.i, the only dispute here is whether using a copyrighted work as part of a lawsuit is a "commercial" use under § 107.  The Court concludes that, at least in this case, it is not.  Although Rothman obviously stands to gain if she is successful in her civil lawsuit in California, damages from that case are compensation for suffered harms rather than profits earned from the sale of goods or provision of services.  *Shell v. Devries*, No. CIV. 06-cv-00318, 2007 WL 324592, at *4 (D. Colo. Jan. 31, 2007) (use of materials in motion for attorney fees was not a commercial use), *aff'd*, No. 07-1086, 2007 WL 4269047 (10th Cir. Dec. 6, 2007).

Moreover, "a judicial or arbitration proceeding serves a salutary truth-seeking function, and cannot be characterized as a purely 'commercial' endeavor, even though money damages might well be at stake." *Images Audio Visual Prods., Inc. v. Perini Bldg. Co.*, 91 F. Supp. 2d 1075, 1083 (E.D. Mich. 2000).  Therefore, the Court finds that, at least in this case, Rothman's use of the work is non-commercial even though it is clearly self-serving.

Having considered all aspects of the purpose and character of Defendant's use, including Defendant's conduct, the transformativeness of her use, and her non-commercial purpose, the Court concludes that the purpose and character of Defendant's use weighs against fair use. Ultimately, Rothman copied the work in spite of and in breach of numerous confidentiality agreements with Plaintiff.  *Cf. Wollersheim*, 971 F.2d 364 at 365 (acknowledging that the underlying work found to have been used fairly was stolen, but not by the defendant); *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., Inc.*, 621 F.2d 57, 61 (2d Cir. 1980) ("The fair use doctrine is not a license for corporate theft . . . .").  This conduct is not overcome by her eventual use of the work to prepare for a potential lawsuit against Peteski and Dr. McGraw. Accordingly, the first fair use factor weighs against fair use.

### 2.  Nature of the Copyrighted Work

Under this factor, courts generally consider two distinct inquiries.  *See, e.g., MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1268 (11th Cir. 2014).  First, highly creative or fictional works are generally afforded "maximal protection, and hence it is less likely that use of such works will be fair use."  *Patton*, 769 F.3d at 1268; *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 410 (5th Cir. 2004).  Second, use of an unpublished work is less likely to be fair use.  *Patton*, 769 F.3d at 1268; *Harper & Row*, 471 U.S. at 564.

### i.      Whether the Video is Factual or Fictional

Plaintiff argues that its copyrighted work is "expressive" and thus "the second factor of the analysis also weighs against Rothman's asserted defense of fair use."   (Dkt. No. 32 at 27.) Defendant responds that the "nature of the recording was factual."[5]   (Dkt. No. 10 at 15; Dkt. No. 35 at 7.)

Navigating between the "paradigmatic example of a creative work" and a "bare factual compilation" is "treacherous."  *Patton*, 769 F.3d at 1270 n.28.  *See also Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903) (Holmes, J.) ("It [is] a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.").   This is particularly true with respect to videos, like the one at issue here, which depict actual events.   For example, courts have frequently reached different conclusions regarding whether candid photographs should be treated as factual because of what they depict or fictional based on the circumstances under which the work was made.   *Compare Galvin v. Illinois Republican Party*, 130 F. Supp. 3d 1187, 1195 (N.D. Ill. 2015) (candid image was factual), *with Baraban v. Time Warner, Inc.*, No. 99 CIV. 1569 (JSM), 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000) (photo was not factual because it was "shot . . . from a low angle framed dramatically, even heroically, against the sky").   *See also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) ("Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature.").   Other courts have simply found this factor to be neutral where a candid photograph, depicting or

---

[5] To the extent Defendant argues that Plaintiff "has failed to meet its burden of establishing a triable issue" on the nature of the video, (Dkt. No. 35 at 7), the Court disagrees.  In evaluating this factor, the Court looks to the video itself, which was submitted by Defendant (Dkt. No. 38), and the means by which the video was stored, which is not disputed because Rothman admitted she took the video from the "Dr. Phil Show" video archive.  (Dkt. No. 32-5 at 218:25–219:2 ("Q. So you took it off the CBS  -- I mean, the "Dr. Phil Show" CBS database? A. Yeah.").)

documenting factual subject matter, is created as a result of "both technical skill and aesthetic judgment." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 408 (S.D.N.Y. 2016) ("[T]he images at issue contain both informational and creative elements, rendering the degree of creativity a relatively neutral consideration . . . ."); *Balsley v. LFP, Inc.*, 691 F.3d 747, 760 (6th Cir. 2012) (candid photograph of woman "possess[ed] a mixed nature of fact and creativity"); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) ("Given the difficulty of characterizing the 'nature' of the photographs, we find that the impact of their creativity on the fair use finding is neutral.").

There is no dispute in this case that the underlying work is a "candid recording" of an actual event. (Dkt. No. 32-22 at ¶ 6.) Additionally, both sides agree that the work was created while The Dr. Phil Show production team was "preparing to do a take for an episode of [The Dr. Phil Show]," (Dkt. No. 10 at 15), and that the work was subsequently stored along with other footage in the show's video archive. (Dkt. No. 32-5 at 218:25–219:2.) In light of these facts, the Court concludes that the work "possesses a mixed nature of fact and creativity." *Balsley*, 691 F.3d at 760. Accordingly, this subfactor is neutral.

### ii.    Protection for Unpublished Works

"[F]air use traditionally was not recognized as a defense to charges of copying from an author's as yet unpublished works." *Harper & Row*, 471 U.S. at 550–51. While Congress rejected this absolute rule in § 107, the fact that a work is unpublished continues to "figure prominently in fair use analysis." *Id.* at 553. *See also* 138 Cong. Rec. S17358-01, 1992 WL 275324 (1992) (statements of Sens. Simon, Leahy, Kennedy, Grassley, Metzenbaum, and Kohl) ("[T]his bill [discussing 1992 amendment to § 107] serves to reaffirm the general principles regarding fair use of unpublished works as set forth in the Supreme Court's landmark decision *Harper & Row* . . . .").

16

Plaintiff argues that its work is a "strictly confidential, unpublished work" and therefore this factor weighs strongly against fair use.  (Dkt. No. 32 at 26.)  Defendant offers no response or argument on this point.  The Court agrees with Plaintiff.  Accordingly, factor two, the nature of the copyrighted work, weighs strongly against fair use.

### 3.  Amount Used

Neither side disputes that Rothman copied the entire work by recording the nine-second video from The Dr. Phil Show archives.  (Dkt. No. 32 at 27; Dkt. No. 43 at 13:14-25.)  This is true even though the work itself was originally part of a larger archive.[6]  *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1179 (9th Cir. 2012) (concluding that where numerous photos were stored on archive and only some photos were misappropriated, each photo constituted an individual work that was copied in its entirety under the third fair use factor).

Both sides also agree that this factor does not weigh in favor of fair use.  (Dkt. No. 10 at 16; Dkt. No. 32 at 27–28.)  The Court agrees.  Accordingly, this factor weighs against fair use.

### 4.  Effect on the Market

"This factor requires courts to consider not only actual harm to the market for the original, but also whether widespread use of the work, like the sort complained of by the copyright-holder, would impair the potential market for the original work and any derivative works."  *Compaq*, 387 F.3d at 410.  When the use of a copyrighted work is non-commercial, as here, the Plaintiff must

---

[6] The Court recognizes that such a result has the consequence of rewarding Plaintiff for registering, after the fact, only the portion of the archive that Defendant copied.  That result is mitigated, though, by the fact that attorney fees and statutory damages are not available to a plaintiff, like the one here, who registers a work only *after* a defendant begins to infringe.  *Leland Med. Centers, Inc. v. Weiss*, No. 4:07CV67, 2007 WL 2900597, at *2 (E.D. Tex. Sept. 28, 2007) ("[W]hen a defendant's alleged infringement commences before the copyright is registered, the plaintiff is barred from recovering statutory damages and attorney's fees for both the conduct occurring prior to the registration and any subsequent infringements occurring after the registration."); *Keeling v. New Rock Theater Prods., LLC*, No. 10 CIV. 9345, 2012 WL 5974009, at *2 (S.D.N.Y. Nov. 29, 2012) ("[T]he Copyright Act forbids recovery of statutory damages for copyright infringement relating to an unpublished work when the infringement began before the copyright was registered").  *See also* 17 U.S.C. § 412.

identify and establish "*some* meaningful likelihood of future harm." *Sony*, 464 U.S. at 451. "[O]nce a copyright holder establishes with reasonable probability the existence of a causal connection between the infringement and a loss of revenue, the burden properly shifts to the infringer to show that this damage would have occurred had there been no taking of copyrighted expression." *Harper & Row*, 471 U.S. at 567.

Here, Plaintiff identified two potentially relevant markets. First, Plaintiff argues that there is a potential market for "outtakes" like the video that Defendant copied. (Dkt. No. 32 at 28–29.) Second, Plaintiff argues that there is an illicit market for videos showing celebrities, such as Dr. McGraw, in a less than favorable light.[7] (Dkt. No. 32-12 at ¶ 12.) However, Plaintiff does not wish to exploit either one of these markets. (Dkt. No. 43 at 39:14–16.) Indeed, Plaintiff wants to ensure that *nobody* exploits these markets. (*Id.*) While that may be permitted by copyright law, *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 627 (7th Cir. 2003) ("[F]ederal copyright is . . . available for unpublished works that the author intends never to see the light of day."), it complicates the analysis under the fourth fair use factor. On the one hand, Rothman's copying caused no "loss of revenue" because Plaintiff, unlike the publisher in *Harper & Row*, does not want to disseminate this video (for profit or otherwise). On the other hand, even if a plaintiff does not wish to exploit a potential market at a particular moment in time they are entitled to protect the "*opportunity* to sell" their work in the future. *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987); *Peter Letterese And Assocs., Inc. v. World Inst. Of Scientology Enters.*, 533 F.3d 1287, 1317 (11th Cir. 2008) (finding potential market relevant based on *Salinger* even where plaintiff stipulated that they "never" intended to enter the market); *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012) (citing *Salinger*, 811 F.2d at 99). In light of *Salinger*,

---

[7] Defendant does not dispute that such a market exists. (Dkt. No. 35 at 8–9.) At most, Defendant argues that Rothman's copying would have no effect on this market and that Plaintiff would not exploit this market anyway. (*Id.*)

which this Court finds persuasive, the Court concludes that Plaintiff is entitled to protect its *opportunity* to sell the video even if it does not wish to do so now.

However, even if a potential market exists for the work, Plaintiff must still identify a "causal connection" between the infringement and the affected market. *Harper & Row*, 471 U.S. at 567. At this point, the record does not support an inference that Defendant shared the work with anyone besides the attorneys in the California case. In spite of this, Plaintiff argues that "[e]ven *knowledge* that an unauthorized copy of the video, or of videos like it, is in the possession of a third party, could negatively impact Peteski's willingness and ability to use such video." (Dkt. No. 32-12 at ¶ 15.) However, there is no evidence that the National Enquirer, or some other tabloid, knew of this recording (or one like it) before the filing of this lawsuit. To the extent these third parties are now aware that Rothman has a video of interest to tabloids, it is the result of Plaintiff's lawsuit rather than Defendant's copying.[8]

Accordingly, while Plaintiff has identified a market for the work that it may someday exploit, it has failed to identify evidence from which a jury could conclude that Rothman's copying impacted that market at all. Therefore, the Court concludes that this factor weighs in favor of fair use.[9]

## IV.   Conclusion

Overall, the Court finds that there is no genuine dispute as to any material fact and therefore summary judgment on the issue of fair use is appropriate. Defendant, by her own admission, took an unpublished work that did not belong to her in violation of confidentiality agreements with

---

[8] *See Guttenberg v. Emery*, 26 F. Supp. 3d 88, 95 (D.D.C. 2014) (explaining "The Streisand Effect," by which litigation seeking to silence a particular criticism merely draws more attention to that criticism).

[9] To the extent Defendant argues that Plaintiff's copying harmed the market for the *other* footage included in the archive, (Dkt. No. 32 at 29), there is still no connection between Defendant's use and a harm to the market for those works. Additionally, the Court declines to consider effects on the potential market for works that were not asserted here. (Dkt. No. 43 at 39:18–40:3 (discussing two other videos).)

Plaintiff "solely" for her personal benefit rather than for commentary, criticism, or public benefit. In light of these circumstances, based on the undisputed facts in the record, and after carefully weighing all the factors discussed above, the Court concludes that summary judgment in favor of Plaintiff is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte* . . . ."); *British Caledonian Airways Ltd. v. First State Bank of Bedford, Tex.*, 819 F.2d 593, 595 (5th Cir. 1987) ("[Movant's] own motion for summary judgment opened the door to allow the district court to grant summary judgment for Bedford Bank *sua sponte* . . . ."); 10A Charles A. Wright, et al., *Federal Practice and Procedure* § 2720.1   (4th ed. 2017) ("[T]he weight of authority is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56.").

 Accordingly and for the reasons set forth above, Defendant's Motion for Summary Judgment (Dkt. No. 10) is **DENIED** as regards the issue of fair use and, *sua sponte*, summary judgment is hereby **GRANTED** for Plaintiff on that issue.[10]

 **So ORDERED and SIGNED this 30th day of August, 2017.**


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

---

[10] To the extent Defendant's evidentiary objections are not addressed herein, they are overruled.